[No. F030545. Fifth Dist. Mar. 2, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
CARRY JOE VANG et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.-XII.

**COUNSEL**

Craig T. Wormley for Defendant and Appellant Carry Joe Vang.

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant Chue Dou Yang.

Rudy Petilla for Defendant and Appellant Kue Lao.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Robert P. Whitlock and Randall A. Pinal, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WISEMAN, J.**—The convictions in this case stem from the drive-by shootings at two residences occurring within a very short time of each other. The facts are all too familiar: one of two warring gangs exacts revenge on the other in retaliation for prior gang activity and perceived slights to pride. In the published portion of this opinion we hold that substantial evidence supports eight attempted murder convictions, and attendant true findings of related enhancements. Penal Code section 188's express malice requirement is met even though defendants could not see all their victims during the shooting rampage. We conclude that spraying an occupied residence with bullets from high-powered assault rifles manifests a deliberate intention to unlawfully take the lives of its inhabitants.

### PROCEDURAL HISTORY

By information, defendants were charged with murder (count 1; Pen. Code,[1] § 187), attempted murder (counts 2-12; §§ 664, 187), vehicle theft (count 13; Veh. Code, § 10851, subd. (a)), and street terrorism (count 14; § 186.22, subd. (a)). It was further alleged as follows: in counts 1 through

---

[1]All statutory references are to the Penal Code unless otherwise noted.

13, that the offenses were done to benefit a criminal street gang (§ 186.22, subd. (b)(1)); on counts 1, 2, 7 and 10, that defendants discharged a firearm from a motor vehicle (§ 12022.55); in count 1, that defendants discharged a firearm from a motor vehicle with intent to inflict great bodily injury (§ 190, subd. (c)), and with the special circumstance of discharging a firearm from a motor vehicle with the intent to cause death (§ 190.2, subd. (a)); in counts 2 and 10, that defendants personally inflicted great bodily injury (§ 12022.7); and in counts 3, 4, 5, 6, 8, 9, 11 and 12, that defendants personally used a firearm (§ 12022.5, subd. (a)).

Jury trial began on November 24, 1997. Following defendants' motion for acquittal under section 1118.1, the court dismissed the allegations that defendants discharged a firearm from a motor vehicle (§ 12022.55) in counts 7 and 10, as well as the personal firearm use enhancements (§ 12022.5, subd. (a)) in counts 8, 9, 11 and 12, and the great bodily injury enhancement (§ 12022.7) in count 10. Thereafter, the jury found defendants guilty as charged, and that the allegations were true. Defendants' motions for new trial or reduction of their convictions were subsequently denied.

Probation was denied, and defendants were sentenced to state prison as follows: 25 years to life on count 1, plus nine consecutive life terms on counts 2-5 and 7-11. In addition, defendants Carry Joe Vang and Chue Dou Yang received aggregate determinate terms of 59 years on the enhancements. Defendant Kue Lao's additional aggregate determinate term was for four years on the enhancements.

All three defendants filed timely notices of appeal.

## Factual History

The charges and allegations arise from two separate gang-related retaliatory drive-by shootings committed within several minutes of each other, which resulted in the death of a three-year-old girl and the wounding of three others.

### The shootings

Between 4:45 p.m. and about 7:30 p.m. on August 21, 1996, Javier Hidalgo's 1993 maroon-colored, four-door Toyota Camry was stolen from his apartment complex on North Fresno Street.

Around 9:30 p.m. that evening, May Moua observed a car pull up in front of her duplex unit located on East Washington, and alerted her husband,

Chang Her. Her opened the front door to get a better look. As he stood at the open doorway with his daughter, Gaohoun, standing by his side, multiple gunfire immediately came from the vehicle. The car was a Japanese-make four-door, and its color was maroon or burgundy. It traveled eastbound on East Washington, made a U-turn, and fired a second volley of shots toward the duplex. There were two or more people in the vehicle, and someone appeared to be sitting in the rear passenger window firing over the top of the car.

Twenty-one shell casings from an AK series assault rifle and five shotgun shells were found at the scene. At least 50 bullet holes dotted the front of the duplex, with the majority focussed on Chang Her's unit. "In fact, there was so much gunfire damage, it was hard to follow each and every hole." The damage spanned a distance of 25 feet, ranging from three inches to six and one-half feet above ground. There was also extensive gunfire damage throughout each unit's interior.

Chang Her's daughter, Gaohoun (count 1), suffered fatal gunshot wounds to the chest and abdomen. May Moua (count 2) received multiple gunshot wounds requiring her to terminate her pregnancy and, by stipulation, caused "great bodily injury." Neither Chang Her (count 4), nor the two other children present, Kalia (count 3) and Andy (count 5), were injured.

A few minutes later and only blocks away, the same high-powered assault rifle was used to spray bullets at an apartment on East University, occupied by the Fang family. Mother Mee Fang (count 10), her son Touhar (count 7), and her daughter Pang (count 11), were watching television by the front window with the lights on. Two other children, Louise (count 8) and Yee (count 9), were watching television in the bedroom. Touhar suffered multiple gunshot wounds and lost the use of his right elbow. Mee was shot in the chest and abdomen, and has suffered mental and physical problems since. None of the other children were injured despite extensive damage to the residence.

One or two people were seen shooting from the grassy area in front of the apartments while backing toward a maroon car stopped nearby. They then got into the car, which sped off with its lights off. Three teenage Asian males were seen in the car.

Around midnight Leanne Moreno saw a burgundy four-door Toyota Camry stop across the street from her house, followed by an orange or brown sedan with two occupants. Three Asian male teenagers appeared nervous as they got out of the Camry and entered the second car. One

appeared to wipe fingerprints off the Camry's exterior. All five left in the second car.

*Gang evidence*

In August 1996, Men or Menace of Destruction (MOD) and Oriental Ruthless Boys (ORB) were rival Hmong street gangs in Fresno with intense animosity between them, and a history of violent conflict. In the street gang culture, any insult or slight may justify a retaliatory response. A failure to retaliate leads to a loss of respect, power or manhood, both within and among gangs, and invites further attacks.

Defendant Vang, age 16, and defendant Yang (also known as Gak), age 17, had MOD tattoos and were active MOD members.[2] In his bedroom, defendant Yang had a mirror with MOD written on it, along with his notebook and a letter he drafted with various MOD scribbling. He also had a photo album containing numerous photos of defendants with known MOD gang members and/or associates, wearing MOD colors, displaying MOD tattoos, and making MOD gang signs with their hands. Defendant Yang was apparently trying to break away from the MOD gang at the time of the shootings.

Defendant Lao (also known as Koolaid), age 17, associated with MOD but was not a member. He did not have a MOD tattoo. A gang "associate" is someone who hangs out with the gang but is not a member because he has not been initiated by being "jumped in." According to Asian gang expert Ramon Gines of the Fresno Police Department, defendant Lao qualified as a member of MOD based on police department criteria. This included defendant Lao's presence in photographs with documented MOD members, and Lao's correspondence with MOD members. The MOD typically would not bring along a nonmember to commit a serious crime, but if he had a long-standing relationship of trust with the gang, then they might involve him.

Chang Her did not belong to any gang. However, his friend and neighbor, Za Xiong, was an ORB gang member. Xiong had moved from the adjoining duplex unit on East Washington two weeks before the shooting. Shortly before Xiong moved out, ORB members, including Touhar Fang, had frequented Xiong's residence for protective reasons because one month earlier Xiong had assaulted a rival MOD gang member.

Two to three months before the shootings, Touhar was accosted by a carload of MOD gang members, including defendants Vang and Yang,

---

[2]The parties stipulated that MOD is a criminal street gang within the meaning of section 186.22, subdivisions (e) and (f).

outside a restaurant near his apartment. The incident occurred while Touhar was walking to the restaurant. After ignoring inquiries of whether Touhar belonged to a gang, defendant Vang and four others exited a brown car and Vang struck Touhar in the face when Touhar denied belonging to a gang. Defendant Yang stood nearby and appeared to have a weapon under his shirt. The group then left in the car, and Touhar walked to his apartment. A short while later, the car returned and stopped near Touhar's apartment. Following the incident, Touhar identified defendant Yang from a photograph.

On August 14, 1996, shots were fired at the residence where defendant Vang lived with his parents and siblings. Defendant Vang had placed his bedroom furniture against the wall nearest the street and had been sleeping on the floor in order to protect himself from street gunfire.

On August 16, 1996, shots were fired at defendant Yang's house, located on North Del Mar. Defendant Yang told police he thought the ORB gang was responsible for the shooting in retaliation for an assault he committed on one of its members.

On August 20, 1996, defendant Vang's family was robbed and assaulted at gunpoint in their home by a group of Hmong males. Defendant Vang was not home at the time. Defendant Vang's father told police his son's enemies, who wanted to kill him, perpetrated the attacks. Defendants Vang and Yang believed the ORB gang was responsible. Based on these incidents, Detective Doug Stokes believed defendants Vang and Yang had personal motives to commit the crimes on August 21, 1996.

*The investigation*

The police determined the Toyota Camry left in front of Leanne Moreno's house was stolen, and that it was involved in the drive-by shootings of August 21, 1996. A plastic bag and receipt from Walgreens drugstore were found on the right front floorboard. The receipt indicated a pair of thick latex gloves and a 10-pack of thinner gloves were purchased at Walgreens near Cedar and Olive in Fresno on August 21, 1996, at 8:33 p.m., one hour before the shootings. A latex glove was found under the driver's seat.

Defendant Lao's fingerprints were found on the Walgreen's bag and inside rearview mirror. Defendant Vang's fingerprints were found on the Walgreen's receipt. Defendant Yang's fingerprints were found on the inside rearview mirror and the exterior of the car. It appeared someone had attempted to wipe down the front exterior of the car.

Two expended shell casings similar to those found at the shooting scenes and a live .25-caliber round were found on the rear passenger floorboard. Ballistics testing revealed that all the expended shell casings recovered were fired from the same assault rifle. However, analysis of the live .25-caliber round was inconclusive.

Defendant Yang was arrested on September 17, 1996, at Yee Yang's residence. When police arrived, defendant Yang went into the room of Yee Yang's sister and hid a loaded .25-caliber semiautomatic handgun in her purse in the closet. Yee Yang (also known as Handy), a former MOD member who frequently hung out with defendants, was arrested on Youth Authority parole violations.

On August 21, 1996, about 11:00 p.m., Yee Yang received a telephone call from defendant Vang telling him to pick him up at Ko Vang's (also known as Tiger) apartment. Defendant Vang sounded nervous, and told Yee Yang he needed to get rid of a car. About 35 minutes later, Yee Yang arrived at the parking lot of Ko Vang's apartment complex, where defendants Vang and Lao were standing by a maroon Camry. Defendant Lao joined Yee Yang in his red/orange Toyota Tercel, and they followed defendant Vang, who was driving the Camry, to a nearby residential neighborhood. Defendant Vang wiped down certain areas inside and outside the Camry before getting into Yee Yang's car. Yee Yang then drove defendants Lao and Vang back to Ko Vang's apartment and went home. Defendants Vang and Lao were nervous because they were dumping a stolen vehicle. Sometime later, the four discussed exercising caution because they had just done a drive-by, and to watch for retaliation by the ORB gang.

In July 1997, after he provided information to the police, Yee Yang was given $300 by police to speak to the police academy about gangs. He was never considered a suspect in the shootings because he had an alibi and was not placed at any of the crime scenes. Although he was initially informed that he could be charged as an accessory to murder after the fact, he was never charged and no law enforcement personnel or prosecutor made a deal with him in exchange for his testimony.

At least three other people told police that defendant Lao was at Ko Vang's apartment complex during the time of the shootings. However, police did not attribute much veracity to the statements because they were made by fellow MOD members or associates, and because the times given were inconsistent, and even if true, still allowed defendant Lao time to commit the crimes.

*Evidence of admissions*

In October or November 1996, while incarcerated in juvenile hall, defendant Vang told Voua Yang, a member of another Asian street gang, that he was in for murder. When Yang asked what kind of murder, defendant Vang stated that he "got some" ORB's. Defendant Vang also admitted shooting the wrong house by mistake; he was trying to get an ORB member named "Za" and his friends, but they had apparently moved.

When police interrogated defendant Lao, he initially denied involvement in the shootings. He claimed he had been swimming at Ko Vang's apartment complex since before dark until about 10:00 p.m., and first learned of the shootings on the evening news. Police suspected defendant Lao was the driver of the Camry and explained to him that under the felony-murder rule, he could be held responsible for murder of the young child. He responded, "I didn't shoot." Several times while Detective Stokes explained the felony-murder rule, defendant Lao stated, "I'm not the shooter. I'm not the shooter." Defendant Lao also said that it was wrong for two people to be responsible for a shooting if one person did not shoot, stating, "American courts suck. It's wrong."

When police interrogated defendant Yang on September 17, 1996, he admitted he was a member of MOD but denied any involvement. The circumstances of his interrogation are detailed later.

Following their arrests, defendants Vang and Lao wrote incriminating letters to various people. Two of defendant Lao's letters suggested an alibi for him on the night in question. One of defendant Vang's letters implored the addressee not to cooperate with police. Another of his letters acknowledged it was a hit against ORB that was successful against one member and his mother. In the other they injured "this one bitch and her daughter was the one that passed away." Defendant Vang also urged further retaliation for what was done to his family, "So that's why I had asked you to funks them O.R.B.'s up for me." He also stated, "I want you to really handle them O.R.B. fools good." He also acknowledged, "I was by myself out here I did hella shit and it was mostly me and - but mostly I ran the shit. If I wanted something done I did it myself unless the [MOD] wants to help . . . ."

*Defense*

The only defense evidence presented was by defendant Lao. His evidence was that, on September 17, 1997, a defense investigator went to apartments

on West Ashlan. The investigator went to apartment 128 to conduct an interview with Ko Vang, who came out of that apartment. However, the investigator was unable to complete the interview.

<h2 style="text-align:center">DISCUSSION</h2>

I. *Substantial evidence supports the attempted murder convictions in counts 2, 3, 5, 6, and 8 through 11.*

 Defendants were convicted of 11 counts of attempted murder. Five of the counts arose from the shooting at the East Washington residence (May Moua (count 2), Kalia Her (count 3), Chang Her (count 4), Andy Her (count 5), and an unnamed ORB gang member (count 6)). Six of the counts arose out of the shooting at the East University residence (Touhar Fang (count 7), Louise Fang (count 8), Yee Fang (count 9), Mee Fang (count 10), Pang Fang (count 11) and an unnamed ORB gang member (count 12)). Defendants Yang and Vang contend the evidence is insufficient to support the convictions in nine of the attempted murder counts (counts 2, 3, 5, 6, 8-12). Specifically, they argue the evidence is insufficient to show intent to kill anyone other than Chang Her at the East Washington residence and Touhar Fang at the East University residence. Respondent appropriately concedes the evidence is insufficient as to count 12 only—the attempted murder conviction of an unnamed ORB gang member at the East University residence. We accept the concession and reject defendants' contentions that insufficient evidence supports the other attempted murder convictions.

 On appeal "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing from it. (*In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].)

 Defendants Yang and Vang argue the evidence is deficient because it fails to prove that the perpetrators intended to kill any inhabitant other than Chang Her and Touhar Fang. This is due to the location of bullets centered around the area where Her and Fang could be seen from the street. They argue this indicates a specific intent to kill them but not anyone else. Defendants acknowledge bullets hit each residence, but argue this was due to the movement of the car during the Her shooting, and because of movement by the shooters at the Fang apartment. We disagree. The jury drew a

reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up. (See, e.g., *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463-1464 [83 Cal.Rptr.2d 307]; *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1436-1437 [18 Cal.Rptr.2d 371].) Defendants' argument might have more force if only a single shot had been fired in the direction of where Chang Her and Touhar Fang could be seen.[3] In light of the facts summarized earlier, the inferences defendants would have this court draw are unreasonable and were properly rejected by the jury. Stated briefly, section 188 provides that malice aforethought "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." In this case, defendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings. The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed.

In addition, other evidence supports the inference of specific intent to kill relatives residing in the homes and ORB member Za Xiong, who only recently had lived in the adjoining East Washington duplex unit, which was also subjected to defendants' gunfire. Defendants Yang and Vang were active members of MOD, a criminal street gang that had engaged in a deadly ongoing war with a rival street gang, the ORB. Their own families had fallen victim to two drive-by shootings, a home invasion robbery and assault at gunpoint by suspected ORB gang members shortly before their retaliation. Expert evidence established that retaliation regularly includes the families of rival gang members. Finally, defendant Vang stated he shot the wrong house by mistake, intending to kill "Za" and "his friends." The fact Za was not present during the attempt did not relieve defendants of their criminal attempt to kill him. ■ "[T]he proof is generally deemed sufficient if the *means* used by the defendant, and the surrounding *circumstances* make the crime *apparently possible*." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 61, p. 269.) As explained in Witkin & Epstein:

---

[3]Defendants' reliance on *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1475 [250 Cal.Rptr. 836], is misplaced. There the court considered whether the doctrine of transferred intent applied where, in attempting to kill one person, the defendant aimed his gun at the person and fired at least two shots, striking his target and a person (Johnson) seated next to the target. (*Id.* at pp. 1472-1475.) The attempted murder of Johnson was reversed due to instructional error that the doctrine of transferred intent could apply to the attempted murder of Johnson. (*Ibid.*) However, retrial was permitted on a theory of specific intent to kill Johnson. (*Id.* at pp. 1478-1479.) Thus, *Czahara* is consistent with a holding here that the jury could find specific intent to kill based on the manner and number of shots fired.

"There may be a punishable attempt where the circumstances make accomplishment of the objective *apparently* possible, even though it cannot in fact be accomplished.

"Thus, in *People v. Lee Kong* (1892) 95 C. 666, 30 P. 800, a policeman bored a hole through the roof of defendant's building to observe defendant's lottery game. Defendant learned of this, waited one night until he thought the policeman was at his post, and fired through the hole. The officer was at the time on another part of the roof. *Held,* defendant was guilty either of an assault with intent to kill, or an attempt. (95 C. 668.)" (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 63, p. 272.)

Here, as in *People v. Lee Kong, supra,* 95 Cal. 666, the fact that Za Xiong had moved and was not present at the duplex when defendants attempted to kill him does not make the evidence insufficient. "The fact that the officer was not at the spot where the attacking party imagined he was, and where the bullet pierced the roof, renders it no less an attempt to kill." (*Id.* at p. 668.) Further, under *People v. Scott* (1996) 14 Cal.4th 544 [59 Cal.Rptr.2d 178, 927 P.2d 288], had another officer been killed by Lee Kong's bullet, Lee Kong could have been charged both with murder of the deceased officer and attempted murder of the absent officer that he intended to kill. Lee Kong's criminal liability for causing the death of the unintended victim could be determined on a theory of transferred intent and his criminal liability for attempting to kill his intended victim is that to which the law assigns. (*Id.* at p. 546.) The doctrine of transferred intent connotes a policy. "Contrary to what its name implies, [it] does not refer to any actual intent that is 'used up' once it has been employed to convict a defendant of a specific intent crime against an intended victim." (*Ibid.*)

In sum, substantial evidence supports all the attempted murder counts with the exception of count 12, for which no evidence was presented that defendants intended to kill an unnamed ORB gang member.

II.-XII.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed on count 12 for insufficient evidence as to all defendants. The judgment as to Yang is modified to reflect an award of 631 days of precommitment credit, and the court is directed to amend the

*See footnote, *ante*, page 554.

abstract of judgment to reflect this modification. The order denying the motions for new trial is vacated, and the matter is remanded for a limited rehearing of the motions in accordance with the rule announced in *People v. Robarge* (1953) 41 Cal.2d 628, 634 [262 P.2d 14], and reaffirmed in *People v. Davis* (1995) 10 Cal.4th 463, 524 [41 Cal.Rptr.2d 826, 896 P.2d 119]. If the court finds the evidence insufficient pursuant to its independent review, it shall articulate its findings, grant the motions, and set the matter for a new trial. If the court finds the evidence is sufficient to support the verdicts, it shall enter an order denying the motions and reinstating the judgments.

Vartabedian, Acting P. J., and Harris, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 20, 2001.