Filed 5/23/13  P. v. Calderon CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIGUEL CALDERON,<br><br>    Defendant and Appellant. | F063435<br><br>(Super. Ct. No. VCF239260A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  James W. Hollman, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Seventeen-year-old Miguel Calderon retaliated against rival gang members by shooting numerous shots at the house where a confrontation had occurred between the rival gang members and him. One of the bullets struck a small child causing serious, but not fatal, injuries. A jury convicted Calderon of six counts of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and one count of shooting at an inhabited dwelling (§ 246). In addition, the jury found true numerous enhancements, including personal use of a firearm resulting in great bodily injury within the meaning of section 12022.53, subdivisions (b) through (d). Calderon was sentenced to 120 years to life in prison.

Calderon contends his conviction must be reversed because the trial court erroneously instructed the jury and the prosecutor committed misconduct. We reject these arguments.

In addition, Calderon asserts his sentence constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. Recent opinions by the United States Supreme Court (*Graham v. Florida* (2010) 560 U.S. 48 (*Graham*)) and the California Supreme Court (*People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*)) confirm that the sentence imposed violates the Eighth Amendment. Accordingly, we will reverse the judgment and remand the matter to the trial court for resentencing. At that time the trial court can correct an error in the custody credits to which Calderon is entitled.

## FACTUAL AND PROCEDURAL SUMMARY

### *The Evidence*

Miguel Claves was watching television with his two-year-old son sitting on his lap when he heard gunshots outside. One of the bullets entered through the window and Claves felt pain in his leg. When Claves stood up, he discovered the bullet had struck his son in the stomach area and had exited out his back. His son was in the hospital for

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

several days, but survived. Claves's stepson, Oscar, and two of his friends, Ramon and Alejandro, were at the house during portions of that night and at the time of the shooting.

Ramon explained that earlier in the evening he had been in the front yard of the house with Oscar, Luis, and Alejandro. Calderon and Christian Garcia walked by and made a gang-related comment, to which Ramon responded. Oscar then lit some fireworks, apparently causing Calderon and Garcia to believe a gun had been fired and resulting in their running away. A short while later Ramon went into the backyard of the house while Oscar and Alejandro went inside the house. Luis then left.

While Ramon was in the backyard, he saw Calderon and Garcia approach and stop a short distance away from the house. Calderon then began shooting at the house with a rifle. Calderon fired a lot of shots.

Oscar's and Ramon's testimony essentially were consistent. Oscar explained that he and Alejandro had gone inside the house just prior to the shootings to use the restroom. He also admitted he discharged the fireworks when Calderon and Garcia walked by the house.

Evidence technicians recovered fourteen .22-caliber bullet casings from the street approximately 111 feet from the Claves house.

While Calderon was in juvenile detention, an officer overheard Calderon say he had shot a "scrap's brother." Calderon also said he hoped the child would survive.

Calderon gave a statement to the police that was recorded and played for the jury. He admitted that he shot at the Claves house, but claimed the shooting was in retaliation for an incident that had occurred earlier that evening. In the first incident Calderon and Garcia were walking by the Claves house when Garcia made a comment to the group that was in front of the house. Luis responded by saying, "Shoot that fool." Calderon heard the sound of a gun being cocked and then heard a gunshot. Calderon took off running.

Calderon and Garcia obtained a rifle, returned to the house, and Calderon fired numerous shots at the house. Calderon did not know there were small children in the

3.

house and did not know he had shot one of the children. He was not aiming at anybody, just the house.

The prosecution's gang expert identified both Calderon and Garcia as being active members of the Norteno criminal street gang. The expert also testified that Alejandro and Oscar were active members of the Sureno criminal street gang, and that Ramon was an associate of the Sureno criminal street gang. Finally, the expert testified that Calderon and Garcia committed the crime for the benefit of the Norteno criminal street gang.

### *The Information, Verdict, and Sentencing*

The information charged Calderon with a separate count of attempted murder for each of the six occupants in the house at the time of the shooting, in violation of sections 664 and 187, subdivision (a). The seventh count charged Calderon with shooting at an inhabited dwelling, in violation of section 246.

In addition, each count included the following allegations: (1) the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C); (2) Calderon personally and intentionally discharged a firearm, causing great bodily injury within the meaning of section 12022.53, subdivisions (b) through (d); and (3) Calderon was at least 16 years old at the time the crime was committed within the meaning of Welfare and Institutions Code section 707, subdivision (d)(1).

The jury found Calderon guilty as charged and found all special allegations to be true.

The trial court sentenced Calderon to a term of 15 years to life for each attempted murder conviction, plus an additional term of 25 years to life on each count for the section 12022.53, subdivision (d) firearm enhancement. The sentences on counts 1, 2, and 3 were ordered to run consecutively, and the remaining counts were ordered to run concurrently. The sentence on the shooting at an inhabited dwelling count was stayed

pursuant to section 654. Calderon was sentenced to a total indeterminate term of 120 years to life.

## DISCUSSION

### I.    Jury instructions

The prosecution's theory to support the attempted murder charges was that Calderon returned to the Claves home with the rifle to kill Ramon, Alejandro, and Oscar. The prosecutor argued Calderon had the intent to kill these individuals when he shot at the house. In addition, the prosecutor argued that Calderon had the intent to kill Claves, his wife, and his son because they were within the "kill zone," and Calderon intended to kill everyone within that zone.

The trial court instructed the jury on this theory with CALCRIM No. 600, without objection, as follows:

> "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] One, the defendant took a direct but ineffective step -- the defendant took direct but ineffective steps toward killing another person; and [¶] Two, The defendant intended to kill that person.

> "A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

> "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of attempted murder of victim A.H., Miguel Claves, Edelmira Hernandez, the People must prove that the defendant not only intended to kill Oscar …, Ramon …, and [Alejandro] … but also either intended to kill victim A.H., Miguel Claves, Edelmira Hernandez, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill victim A.H.,

Miguel Claves, Edelmira Hernandez or intended to kill Oscar …, Ramon …, [Alejandro] … by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of victim A.H., Miguel Claves, Edelmira Hernandez."

During deliberations the jury sent the following question: "What is the definition of kill zone and how do you define its boundaries." After conferring with the attorneys, and receiving no objection, the trial court responded to the jury's question as follows: "Please refer to the last paragraph in Jury Instruction #600. A 'kill zone' theory is not a legal doctrine requiring a special jury instruction. Rather, it is simply a reasonable inference that you, the jury, may draw depending upon what you determine to be the facts."

Relying on the trial court's general obligation to instruct the jury correctly, Calderon argues the trial court erred by failing to reply adequately to the jury's question. According to Calderon, the jury "obviously did not feel they adequately understood" the kill zone theory, so the trial court was obligated to provide additional guidance. Calderon asserts the kill zone theory applies in at least two distinct situations: (1) where shots are fired at a primary target that is located near a group of people, and (2) where shots are fired at a group of people where there is no primary target. The trial court could have, according to Calderon, explained this distinction to the jury, thus providing guidance in addition to the instruction already given. Thus, the trial court "erred in failing to provide to the jury a clarifying definition of 'kill zone' as requested by the jury."

We reject Calderon's argument for a variety of reasons. First, he misunderstands the two cases on which he relies. To support his theory that there are two distinct situations in which the kill zone theory applies, Calderon cites *People v. Bland* (2002) 28 Cal.4th 313 (*Bland)* and *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*). We begin with *Bland*, a case that addresses the kill zone theory.

Bland and another man shot and killed Kenneth Wilson, a member of a rival gang. Wilson was driving a car at the time of the shooting. Two of his friends who were not

6.

gang members also were in the car at the time. When the shooting started, Wilson was able to drive a short distance before the car crashed. Bland and his accomplice continued shooting at the car, injuring the two passengers.

Bland was convicted of the murder of Wilson and the attempted murder of the two passengers. The evidence suggested that Bland intended to kill Wilson, but did not specifically target the passengers. The prosecution argued the intent to kill Wilson was transferred to the two passengers, thus providing the requisite intent for the attempted murder convictions. The trial court instructed the jury on the transferred intent doctrine.

The Supreme Court explained that transferred intent, which has been a part of California law since the murder statute was passed in 1872, applies when a defendant "'who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had "'the fatal blow reached the person for whom intended.'" [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' [Citation.]" (*Bland, supra,* 28 Cal.4th at p. 321.)

The Supreme Court explained how the transferred intent doctrine applies in different factual contexts and concluded, "Whether one conceptualizes the matter by saying that the intent to kill the intended target transfers to others also killed, or by saying that intent to kill need not be directed at a specific person, the result is the same: assuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*Bland, supra,* 28 Cal.4th at pp. 323-324.)

The Supreme Court next addressed the question of whether transferred intent can apply to the crime of attempted murder. After addressing several appellate court cases, the Supreme Court concluded that transferred intent does not apply to the crime of attempted murder:

7.

"We explained above that intent to kill is not 'used up' with the killing of the intended target but extends to every person actually killed. But this rationale does not apply to persons not killed. We see no suggestion the Legislature intended to extend liability for unintended victims to an inchoate crime like attempted murder. The crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences.

"The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.] But over a century ago, we made clear that implied malice cannot support a conviction of an *attempt* to commit murder. '"To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder, he must so intend." [Citation.] "The wrong-doer must specifically contemplate taking life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder." [Citation.]' [Citations.]

"We should also distinguish between a completed murder and attempted murder regarding transferred intent. Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland, supra,* 28 Cal.4th at pp. 327-328.)

However, the Supreme Court also explained that even though transferred intent could not support an attempted murder conviction, a person who shoots at a group of people can still be punished for the attempted murder of everyone in the group under the kill zone theory.

"As to the nontargeted members of the group, the defendant might be guilty of crimes such as assault with a deadly weapon or firing at an occupied vehicle. [Citation.] More importantly, the person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory. The *Ford* [*v. State* (1993) 330 Md. 682 [625 A.2d 984]] court discussed this last point in explaining why one of its earlier cases (*State v. Wilson* (1988) 313 Md. 600 [546 A.2d 1041]) correctly

8.

affirmed attempted murder convictions even though it erred in relying on transferred intent. 'The result in *Wilson* can best be explained and justified by distinguishing between transferred intent and what is essentially concurrent intent.' (*Ford v. State, supra,* 625 A.2d at p. 1000.)

"The *Ford* court explained that although the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent … when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. This situation is distinct from the "depraved heart" [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a "depraved heart" [implied malice] scenario.' (*Ford v. State, supra,* 625 A.2d at pp. 1000-1001, fn. omitted.)

"California cases that have affirmed convictions requiring the intent to kill persons other than the primary target can be considered 'kill zone' cases even though they do not employ that term. In *People v. Vang* (2001) 87 Cal.App.4th 554, 563-565, for example, the defendants shot at two occupied houses. The Court of Appeal affirmed attempted murder charges as to everyone in both houses—11 counts—even though the defendants may have targeted only one person at each house. 'The jury drew a

reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up.… The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed.' [Citations.]" (*Bland, supra,* 28 Cal.4th at pp. 329-330.)

The Supreme Court concluded the facts in the case before it compelled the same conclusion. "Even if the jury found that defendant primarily wanted to kill Wilson rather than Wilson's passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (*Bland, supra,* 28 Cal.4th at pp. 330-331.)

Important to this case is the Supreme Court's observation in a footnote: "This concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6.)

The Supreme Court applied these concepts to the facts before it in concluding that the kill zone theory was applicable. "In this case, defendant's intent to kill Wilson does not transfer to [the passengers]. This is so, not because defendant killed his intended target, but because transferred intent does not apply to attempted murder. Whether defendant is guilty of attempted premeditated murder of [the passengers] depends on his mental state as to them, not on his mental state as to Wilson." (*Bland, supra,* 28 Cal.4th at pp. 331-332.) "Moreover, we agree … that the evidence here virtually compelled a finding that, even if defendant primarily wanted to kill Wilson, he also, concurrently, intended to kill the others in the car. At the least, he intended to create a kill zone." (*Id.* at p. 333.)

10.

*Stone* involved a defendant who shot into a group of people without a specific target. The Supreme Court held that because the "mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being," the defendant could be convicted of attempted murder. (*Stone, supra,* 46 Cal.4th at p. 134.)

The facts, unsurprisingly, involved a confrontation between rival gangs. After an initial confrontation, members of the rival gang, including the defendant, returned to the scene of the original confrontation. These members observed approximately 10 members of the other gang sitting on the ground. Stone pulled a gun, and without identifying a specific target, fired a single shot at the group. The jury found Stone guilty of attempted murder. Stone appealed, arguing there was no evidence that he had targeted an individual, and therefore he could not be convicted of attempted murder.

The Supreme Court began its analysis by discussing *Bland* in detail, and specifically the discussion of the "kill zone" contained therein. (*Stone, supra,* 46 Cal.4th at pp. 137-138.) However, like the Court of Appeal, the Supreme Court concluded that the trial court erred in instructing the jury with the kill zone theory. (*Id*. at p. 138.) "The kill zone theory simply does not fit the charge or facts of this case. That theory addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons. Here, defendant was charged with but a single count of attempted murder. He was not charged with 10 attempted murders, one for each member of the group at which he shot. As the Court of Appeal explained, 'There was no evidence here that [defendant] used a means to kill the named victim, Joel F., that inevitably would result in the death of other victims within a zone of danger. [Defendant] was charged only with the attempted murder of Joel F. and not with the attempted murder of others in the group on which [defendant] fired his gun.'" (*Ibid*.)

Nonetheless, the Supreme Court concluded that one "who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An

11.

indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone, supra,* 46 Cal.4th at p. 140.)  The Supreme Court explained that "One difference regarding intent to kill does exist between murder and attempted murder.  A person who intends to kill can be guilty of the murder of each person actually killed, even if the person intended to kill only one.  [Citation.]  The same is not necessarily true regarding attempted murder.  Rather, 'guilt of attempted murder must be judged separately as to each alleged victim.'  [Citation.]  But this is true whether the alleged victim was particularly targeted or randomly chosen.  As the district attorney aptly summarizes in this case, 'A defendant who intends to kill one person will be liable for multiple counts of murder where multiple victims die, but only one count of attempted murder where no one dies.'  But when no one dies that person *will* be guilty of attempted murder even if he or she intended to kill a random person rather than a specific one." (*Id*. at p. 141.)

Calderon's assertion the kill zone theory applies where the defendant fires at a group of people without a specific target is simply wrong.  The Supreme Court stated that these facts are inconsistent with the kill zone theory.  (*Stone, supra,* 46 Cal.4th at p. 138.)

Not only is Calderon's argument unsupported by the cases cited by him, the jury instructions were correct.  Calderon did not object to the initial instruction on the kill zone theory, and this indeed is a correct statement of the law.  Nor does he object to the initial instruction on appeal.  Instead, he focuses on the trial court's response to the jury's question, but in doing so he ignores the most important part of the response.

The trial court's response contained two parts.  In the second part of the response, the part on which Calderon focuses, the trial court relied on the above quoted footnote from *Bland* to tell the jury that "A 'kill zone' theory is not a legal doctrine requiring a special jury instruction.  Rather, it is simply a reasonable inference that you, the jury, may draw depending upon what you determine to be the facts."  This is a correct statement of the law and also responded to the jury's question.  But, more importantly, in

the first part of its response the trial court also instructed the jury to review CALCRIM No. 600 for the full explanation of the kill zone theory.

This was a thorough response to the jury's question and obviously provided all the aid the jury needed because they returned with a verdict a short while after receiving the response. There was no error and, accordingly, trial counsel was not ineffective for failing to object to the response.

## II.     Prosecutorial Misconduct[2]

During closing argument, the prosecutor attempted to draw the distinction between Calderon the gang member and Calderon the defendant. "Now, we've been sitting here for the past five days, and you've been looking at Mr. Calderon. Every day he's had a nice shirt on, his hair's nicely groomed, he's got some glasses on, he's got a nice tie on."

At this point defense counsel objected, the trial court overruled, and the prosecutor continued his argument. "But is this the real Miguel Calderon? Yes, his physical being sits here in the courtroom for the past five days. But is that actually who he is. No. He's done up by his attorney or by his family who provides him the clothing."

Defense counsel again objected and the trial court sustained the objection. The prosecutor then continued his argument that Calderon was a gang member acting on behalf of the gang when he shot at the Claves house.

Calderon contends that the first comment was an improper comment on his demeanor, requiring reversal. *People v. Boyette* (2002) 29 Cal.4th 381 explains

---

[2]"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

13.

"comment during the guilt phase of a capital trial on a defendant's courtroom demeanor is improper [citation] unless such comment is simply that the jury should ignore a defendant's demeanor [citation]. 'In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character.' [Citation.]" (*Id*. at p. 434.)

In *Boyette* the prosecutor argued in closing argument, "[Defendant is a v]ery remorseless, cold-blooded individual .… Remember, appearances can be very deceiving and he's been working on you. He has been working on you, watching you come and go, smiling and waving when he's introduced to you. Appearances, ladies and gentlemen, can be very deceiving." (*Boyette, supra,* 29 Cal.4th at p. 434.) The Supreme Court concluded the prosecutor's comments were ambiguous, but the comments constituted misconduct to the extent she was suggesting the defendant was duplicitous based on his courtroom demeanor. (*Ibid*.) The Supreme Court, however, found no prejudice because (1) the defendant testified, (2) the comments were brief, (3) and there was ample evidence of the defendant's guilt and lack of credibility. (*Id*. at pp. 434-435.)

The comments to which Calderon objected here were far less egregious. The comments could be interpreted as suggesting that he was duplicitous because his appearance in court was far different than his actions outside the courtroom. Even if we were to assume misconduct, however, there is no possibility that Calderon suffered any prejudice. The comments were brief, they were not strictly comments on demeanor, and the evidence against Calderon, including his own confession, was overwhelming. Since there was no pattern of conduct that infected the trial with unfairness, and the prosecutor

14.

did not use deceptive or reprehensible methods to attempt to persuade the jury, there is no discernable prejudice. We thus conclude there are no grounds for reversal.

## III. Custody Credits

The trial court awarded Calderon presentence custody credits of 251 days for time served and 37 days of conduct credits. This credit appears to have omitted the time Calderon spent in the juvenile detention facility. The People concede Calderon should have received credit for the time he spent in the juvenile detention facility. (*People v. Saldivar* (1984) 154 Cal.App.3d 111, 114.) On remand the trial court must correct this error.

## IV. Cruel and Unusual Punishment

Calderon, 17 at the time he committed the crimes of which he was convicted, was sentenced to a term of 120 years to life. In *Graham, supra,* 560 U.S. 48, the United States Supreme Court held that a sentence of life without the possibility of parole for a nonhomicide offense violated the Eighth Amendment's prohibition against cruel and unusual punishment if the offender was under 18 at the time he or she committed the offense. Calderon claims the sentence he received constitutes cruel and unusual punishment because it is virtually certain he will never be released from prison.

The People argue that *Graham* does not apply to Calderon's sentence for three reasons. First, the People assert that attempted murder is a homicide offense, and *Graham* applies only to nonhomicide offenses. Second, *Graham* applies only to sentences of life without the possibility of parole, and Calderon did not receive this sentence. Third, cumulative or consecutive sentences do not implicate the Eighth Amendment.

In *Caballero, supra,* 55 Cal.4th 262, a decision that came out after the briefing in this case was completed, the California Supreme Court considered and rejected each of the People's arguments.

Caballero was convicted of three counts of attempted murder and enhancements for (1) personally and intentionally discharging a firearm (§ 12022.53, subds. (c), (d)), (2) inflicting great bodily harm on one victim (§ 12022.7), and (3) committing the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The charges arose out of an incident where Caballero shot a firearm at three rival gang members, injuring one victim. He was sentenced to a term of 110 years to life. His appeal to the Supreme Court asserted his sentence constituted cruel and unusual punishment, in violation of the Eighth Amendment and *Graham*.

The Supreme Court thoroughly considered, and rejected, each of the People's arguments. (*Caballero, supra,* 55 Cal.4th at pp. 267-269.) Since our case virtually is indistinguishable from *Caballero*, we too reject each of the People's arguments and conclude that Calderon's sentence is cruel and unusual, in violation of the Eighth Amendment. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) To guide the trial court, we quote *Caballero's* conclusion:

> "Consistent with the high court's holding in *Graham* …, we conclude that sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.] Defendants who were sentenced for crimes they committed as juveniles who seek to modify life without parole or equivalent de facto sentences already imposed may file petitions for writs of habeas corpus in the trial court in order to allow

16.

the court to weigh the mitigating evidence in determining the extent of incarceration required before parole hearings. Because every case will be different, we will not provide trial courts with a precise timeframe for setting these future parole hearings in a nonhomicide case. However, the sentence must not violate the defendant's Eighth Amendment rights and must provide him or her a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' under *Graham*'s mandate." (*Caballero,* at pp. 268-269.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for resentencing. At the hearing, the trial court is instructed to recalculate the custody credits to which Calderon is entitled. The judgment is otherwise affirmed.

_____
CORNELL, Acting P.J.


WE CONCUR:


_____
KANE, J.


_____
FRANSON, J.

17.