Filed 10/27/25  P. v. Mathews CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B336330 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA509767) |
| v. | |
| JAMOR JACOB MATHEWS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Karla D. Kerlin, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Susan Sullivan Pithey, Assistant Attorneys General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Jacob Jamor Mathews (appellant) of murder and attempted murder. He asserts that the trial court erred in refusing to limit expert testimony and in instructing the jury on a kill zone theory of attempted murder. Because there was no prejudicial error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Facts

Appellant was a pimp and a member of the Crips in south central Los Angeles.

In June 2021, members of the rival Hoover gang in a Mercedes Benz tried to rob appellant of his jewelry. As appellant fled, the Hoover members shot at him. They then took his car that he left behind, which contained his phone and other belongings. Appellant did not recognize his attackers or their car. Thereafter, appellant was on the lookout for the gold or silver Mercedes Benz he had seen so he could exact revenge.

On July 23, 2021, Deonte Pinkney and 15-year-old Precious B. went to the McDonald's drive-thru on Normandie and Manchester about 3:00 a.m. Pinkney was driving his new silver Mercedes Benz with tinted windows, and Precious B. was in the passenger's seat with the seat reclined. On their way back to Pinkney's home, a white Infiniti SUV with a broken right headlight and no front license plate pulled up next to Pinkney's car, and the two drivers raced next to one another, speeding and then slowing down, for several seconds. The driver of the white Infiniti then fired three shots into Pinkney's car before speeding off. One bullet passed through the front passenger's side window, flew just past Precious B.'s face, and hit Pinkney in the head, killing him instantly. The other two bullets went through the

2

rear passenger's side window and the front windshield on the passenger's side.

One week after the shooting, on July 30, 2021, officers pulled appellant over in his white Infiniti SUV for having a broken headlight. The car had no front license plate. The officers conducted a search and found a black semiautomatic nine millimeter gun.

## 2. Procedural Background

On March 16, 2023, appellant was charged by information with one count each of murder (Pen. Code,[1] § 187, subd. (a)), attempted murder (§§ 664/187, subd. (a)), shooting at an occupied vehicle (§ 246), and being felon in possession of a firearm (§ 29800, subd. (a)(1)). It was further alleged that appellant had suffered a prior strike. (§§ 667, 1170.12.) With respect to the murder and attempted murder counts, it was alleged that appellant personally used a firearm. (§ 12202.5, subd. (a).)

The first trial resulted in a mistrial due to a hung jury. A second jury convicted appellant on all counts and found true the firearm enhancement. The trial court found true that appellant had suffered a prior strike and sentenced him to 50 years to life, plus four years in state prison.

## DISCUSSION

## 1. Any error in declining to limit the testimony of the ballistics expert was harmless.

Appellant's counsel sought to limit the testimony of the ballistics expert who compared the bullet fragments found in Pinkney's car to bullets fired from the gun found in appellant's car when he was arrested. Specifically, appellant asked the court

---

[1] Undesignated statutory references are to the Penal Code.

to preclude the expert from testifying without a doubt that the bullets were fired from the same gun, and to limit the expert to stating that the bullet samples were consistent or similar to one another. The trial court denied appellant's motion to so limit the expert's testimony.

We need not decide whether this was error because any error was harmless under the applicable *Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818; *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error' "].) Had the expert testified that the bullets and fragments were consistent rather than stating without a doubt that they had come from the same gun, it would not have made any difference to the outcome given the other overwhelming evidence that appellant was the one who shot Pinkney.

Footage from surveillance cameras showed a white Infiniti SUV with a broken headlight and no front license plate racing next to Pinkney's car when the shooting occurred. Precious B., who was in the passenger's seat of Pinkney's car when he was shot, testified that the gunfire came from the white car seen in the surveillance footage. Cell tower records showed that appellant's phone was in the vicinity of the shooting when it occurred. Appellant was arrested one week after the shooting after he was pulled over in his white Infiniti SUV that had a broken headlight and no front license plate, like the one seen in the surveillance footage. Appellant's Instagram contained photos and videos of appellant in his white Infiniti SUV with what appeared to be the same black semiautomatic gun found in his car when he was arrested.

4

Several weeks before the shooting, appellant had been attacked and his car stolen by members of the rival Hoover gang, who were driving a car similar to Pinkney's. Appellant's Instagram messages confirmed that since that attack appellant had been on the lookout for a gold or silver Mercedes Benz. Less than two hours after the shooting, at 4:46 a.m., appellant sent a message to his acquaintance Greeneyez, asking, "Who in that car bro?" Appellant asked Greeneyez whether the car was a "BMW or Benz." Greeneyez answered that it was a "Benz," and appellant responded, "oh, yea, mando." At 5:42 a.m., appellant made a post on Instagram with the text, "blow up in his face" with a purple devil emoji, and "stomped down on me" with an emoji of a star—a symbol associated with the Hoover gang.

While appellant was in jail after being arrested, he was recorded speaking on the phone with someone about snitches, stating that he was going to kill some snitch because he was "going to do life anyway." In another recorded call, he stated he was not "worried about it" because he "was by [him]self" and only he "know[s] the truth." When asked about these statements at trial, appellant was unable to provide a coherent explanation. When asked why he said on the phone that he was "going to do life anyway," he responded, "I don't know," and explained that he was "talking in general." When asked what he meant when he said he was by himself, appellant responded, "I always say that I was by myself."

Given the abundance of evidence showing that appellant shot Pinkney, there is no reasonable probability that the jury would have reached a different verdict had the court limited the ballistic expert to testifying that the bullets were "similar" or

"consistent" rather than that they came from the same gun without a doubt.

## 2. Substantial evidence supports the kill zone instruction for attempted murder.

The crime of attempted murder requires the specific intent to kill. (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*), citing *People v. Lee* (2003) 31 Cal.4th 613, 623.) Consequently, a defendant who intends to kill one person, but shoots another person, is not guilty of attempted murder of the second person. (*People v. Bland* (2002) 28 Cal.4th 313, 331 ["transferred intent does not apply to attempted murder"].) However, because "a primary intent to kill a specific target does not rule out a concurrent intent to kill others" (*Bland*, at p. 331, fn. 6), a defendant who "specifically intend[s] to kill every single person in the area in which [his] primary target [is] located"—in the so-called "kill zone"—can be liable for the attempted murder of anyone in that area. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 803; *Canizales*, at p. 606 [defendant is liable under a "kill zone" theory if he "intentionally created a zone of fatal harm"].)

Relevant circumstances from which a jury could properly infer the defendant intended to create a zone of harm include "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, . . . the proximity of the alleged victims to the primary target" (*Canizales*, *supra*, 7 Cal.5th at p. 607), and the placement of the shots (*People v. Vang* (2001) 87 Cal.App.4th 554, 564).

The record in this case contains substantial evidence to support the kill zone instruction. Appellant used a semiautomatic weapon and fired three shots into three separate areas of Pinkney's car: the passenger's side front and rear

windows, and the front windshield. The shots were made at close range—appellant's car was next to or near Pinkney's. Further, appellant's motive to kill anyone who might be inside of the vehicle was shown by the circumstance that he had been seeking revenge on individuals who had robbed him and who he did not recognize, but who he saw in a similar Mercedes Benz. A jury could infer from this that appellant intended to kill everyone inside the car to increase the chance of killing one or more of the individuals who had robbed him. (See *People v. Vang*, *supra*, 87 Cal.App.4th at p. 564.)

Appellant relies on *People v. Booker* (2020) 58 Cal.App.5th 482 to argue that the trial court erred in giving the kill zone instruction, but *Booker* is readily distinguishable. In that case, the shooter drove up to the driver's side window of a stationary vehicle and shot the driver three times at close range. (*Id*. at pp. 489, 500.) The driver's side window was shattered, but no bullet holes were found on any part of the car. (*Id*. at pp. 488, 500.) There was no evidence that any bullets reached the passenger's side of the car, where the only other occupant of the car was sitting. (*Id*. at p. 500.) Nothing in the record suggested the shooter used a semiautomatic or automatic weapon. (*Ibid*.) Here, on the other hand, appellant drove up to the passenger's side window of a moving car and used a semiautomatic gun to shoot several shots at different areas of the car, with one bullet barely missing Precious B.'s face. These circumstances, combined with the strong evidence of appellant's motive to kill the occupants of Pinkney's car, support the kill zone instruction.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


RICHARDSON, J.


GOORVITCH, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.