Filed 9/26/17

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B266897 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA133204) |
| v. | |
| BRIAN ALONZO SAWYERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Lonergan, Judge.  Vacated in part and affirmed in part; remanded for further proceedings.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1 and 3 of the Discussion.

A jury convicted defendant and appellant Brian Alonzo Sawyers of first degree murder, three counts of attempted premeditated murder, and two counts of shooting at an occupied dwelling. The offenses all arose from an incident in which Sawyers and one or more companions fired numerous shots into a house occupied by rival gang members and their family. The trial court sentenced Sawyers to 75 years to life in prison pursuant to the "Three Strikes" law. Sawyers contends sentencing under the Three Strikes law was unauthorized because the information failed to allege his prior offense was a strike. In the published portion of the opinion, we conclude that because the information failed to give Sawyers notice that he faced sentencing under the Three Strikes law, and because the "informal amendment" doctrine does not apply, his sentence must be vacated. In the unpublished portion, we reject Sawyers's contention that the evidence was insufficient to support two of the attempted murder charges. We also agree with the People that the trial court erred by awarding conduct credits. We therefore vacate the sentence, remand for resentencing, and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *Background information*

Eighty-four-year-old Thomas Dunbar and his wife, Mary Dunbar, lived with their daughter, Linda McCarter, at a house located on South Northwood Avenue in Compton. McCarter's twin sons, Kionte and Dionte McCarter, lived there as well.[1]

---

[1] For ease of reference, and with no disrespect, where family members share the same last name we sometimes refer to them by their first names.

Thomas was partially paralyzed, and Mary suffered from dementia. Their bedrooms were in the front of the house and faced the street.

The residence was located in an area claimed as the territory of the Nutty Block Crips criminal street gang. Kionte and Dionte were both Nutty Block Crip gang members, as were other family members and the twins' friend, Brandon Frison. The Dunbar residence was known as a Nutty Block hangout.

Another Crip gang, ATF, was comprised of three Crip gangs that had joined forces: Acacia Block, Spooktown, and Farm Dogs. ATF claimed territory bordering that claimed by Nutty Block, and the two gangs were rivals. In July 2013 the Nutty Block and ATF gangs were engaged in a gang war. Sawyers was an admitted member of the Spooktown gang, and bore gang tattoos, including "NBK" for "Nutty Block killer."[2]

b. *The shooting*

On the morning of July 25, 2013, at approximately 10:00 a.m., Frison was waiting for the McCarter twins on the front porch of the Dunbar residence, talking on the phone, while the twins changed clothes inside the house. Mary was inside, asleep in one of the front bedrooms, and Linda had just lain across the foot of Mary's bed. Thomas was in the other front bedroom, closest to the front door.

A silver Audi A4 and a charcoal gray Toyota Corolla travelled slowly down Northwood. Two Black men were seated inside each vehicle. As one of the vehicles approached the

---

[2] In addition to this gang-related evidence, the People presented the testimony of a gang expert. Because Sawyers does not challenge the sufficiency of the evidence to support the gang enhancements, we do not detail this additional testimony.

3

Dunbar residence, the two men inside fired over 20 gunshots at the house. Frison fled into the Dunbar house as soon as the shooting began. Thomas was shot three times, including a shot to his head that later proved fatal; he had also been hit by bullet fragments. Paramedics transported him to the hospital, where he died of his injuries.

c. *The investigation*[3]

The police investigation of the crimes revealed that at least three guns were used in the shooting, including a semiautomatic rifle capable of firing shots that could penetrate walls. In an undercover ruse operation, Sawyers made inculpatory statements indicating he fired the rifle. A witness told detectives that a week prior to the shooting, one or both of the McCarter twins had beaten Sawyers. On the morning of the shooting, the witness observed Sawyers, armed with a large gun, set off with other gang members in two cars to kill the McCarter twins.

2. *Procedure*

Trial was by jury. Sawyers was convicted of the first degree murder of Thomas (Pen. Code, § 187, subd. (a));[4] the attempted willful, deliberate, and premeditated murders of Linda, Mary and Frison (§§ 664, 187, subd. (a)); and two counts of shooting at an inhabited dwelling (§ 246). As to each offense, the jury found Sawyers, and a principal, personally used and discharged a firearm, causing death (§ 12022.53, subds. (b), (c), (d), (e)(1)), and that the crimes were committed for the benefit of,

---

[3]    We discuss this evidence in more detail where relevant in the unpublished portion of the opinion.

[4]    All further undesignated statutory references are to the Penal Code.

4

at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).  Sawyers admitted suffering prior convictions for first degree burglary and receiving stolen property.  The trial court sentenced Sawyers to 25 years to life for the murder, doubled pursuant to the Three Strikes law, plus a 25-year-to-life sentence on the section 12022.53, subdivision (d) firearm enhancement, for a total term of 75 years to life.  As to each of the remaining counts, the trial court sentenced Sawyers to concurrent terms of 15 years to life, doubled pursuant to the Three Strikes law, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancements.  It stayed the remaining section 12022.53, subdivisions (b), (c), and (e)(1) enhancements and the section 186.22 gang enhancements.  It ordered Sawyers to pay direct victim restitution of $4,076 and imposed a restitution fine, a suspended parole revocation restitution fine, court operations fees, and criminal conviction assessments.  Sawyers appeals.

DISCUSSION

**[[ Begin nonpublished portion ]]**

**[[** 1.  *Sufficiency of the evidence*

Sawyers contends that the evidence was insufficient to support his convictions for the attempted murders of Mary and Linda, because there was no evidence he knew they were in the residence and they were not in Frison's vicinity when the shooting transpired.  He is incorrect.

a.  *Additional facts*

Officers recovered 24 shell casings from the street in front of the houses next to the Dunbar residence.  Fifteen casings were .223 caliber; the others were .45 caliber.  Numerous bullet fragments were recovered from the driveway of the home next to

the Dunbars'. There were 19 bullet strikes on the front of the Dunbar home. There were nine bullet holes in Thomas's bedroom window, as well as numerous bullet marks on his bedroom wall and his bed. There were three bullet holes in Mary's bedroom window, as well as bullet damage to a metal cabinet and a brown dresser in her bedroom. A bullet fragment was also found in Mary's room. Linda's car bore two bullet holes. The house next door to the Dunbar residence had bullet damage to the gate, a drain, a motorcycle, a car, and the garage; one bullet fragment or casing was on the front door mat and another was in the garage. A forensic firearms examiner determined that at least three firearms were used in the shooting, one likely an AR-15 semiautomatic rifle capable of firing shots that could penetrate windows and walls, or even multiple walls.

On September 12, 2013, Los Angeles County Sheriff's Detective Troy Ewing set up an undercover ruse operation in an attempt to obtain incriminating statements from Sawyers. First, Sawyers was placed in a fake lineup and told he had been identified as the shooter. Sawyers was then returned to a holding cell with three undercover detectives. During the six-hour recorded conversation, Sawyers admitted being a Spooktown and ATF gang member. He confirmed he had taken care of covering up his crime, including burning his clothing and getting rid of the gun. He stated that the shooting was committed during the day, in rival gang territory. He boasted about "[g]oing lethal" by personally firing multiple shots from a .223-caliber firearm at a house on Northwood from the back seat of a leased Audi, while his brother fired from two .45-caliber firearms. He confirmed that another vehicle had also been involved. He shot at a person who had been on the phone and

ran toward the house when the shooting began. He believed the person on the porch had seen them "pull up and open fire." Sawyers believed another person had been on the porch as well. Sawyers described the targeted house as a Nutty Block Crips hangout. One of the undercover officers suggested Sawyers should get the Audi detailed to eliminate evidence.

Shortly after the undercover operation concluded, Sawyers made a recorded telephone call to an unidentified female from the jail. He told the woman to make sure the Audi was "detailed."

Detectives interviewed Janice Harvey Sessions, a current or former Spooktown gang member, regarding the shooting. Sessions stated that a week before the shooting, one or both of the McCarter twins had beaten "the hell out of" Sawyers at a Louisiana Fried Chicken restaurant. On the morning of the shooting, she heard Sawyers request that other ATF members go with him to kill the McCarter twins. The perpetrators set off in two cars and Sawyers had a "big gun" that was approximately 20 inches long.[5]

b. *The evidence was sufficient*

When determining whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is

---

[5] Sessions was in custody at the time of the first interview and stated she wanted a "deal" on her pending case in exchange for providing information, but also wanted to help because she knew Thomas. At trial she denied making any statements about the shooting. She claimed her recorded statements were untrue and were the product of coercion, intoxication, or her mental illness.

reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Johnson* (2015) 60 Cal.4th 966, 988.)  We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

To prove attempted murder, the People must establish the defendant intended to kill.  "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  The defendant need not intend to kill a specific target; the intent to kill "*a* human being" rather than "a *particular* human being," is sufficient.  (*People v. Stone* (2009) 46 Cal.4th 131, 134.)  Intent to kill, that is, express malice, requires a showing that the assailant either desires the result or knows, to a substantial certainty, that the result will occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  The required mental state may be inferred from the circumstances.  (*Id.* at p. 741.)

Here, the People contended Sawyers was guilty of the attempted murders of Mary and Linda under the "kill zone" theory.  In *People v. Bland* (2002) 28 Cal.4th 313, the defendant shot at three persons, killing one and injuring the other two.  Our Supreme Court concluded that the doctrine of transferred intent

8

was inapplicable to the crime of attempted murder. (*Id.* at pp. 317, 326.) Nonetheless, *People v. Bland* explained that a person who shoots at a group of people might "still be guilty of attempted murder of everyone in the group" on a concurrent intent or "kill zone" theory. (*Id.* at p. 329.) *People v. Bland* reasoned: "although the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because

9

although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Id.* at pp. 329–330.)

*People v. Vang* (2001) 87 Cal.App.4th 554, cited with approval in *Bland*, is on all fours with the evidence here. In *People v. Vang*, the defendant committed two drive-by shootings, firing at two occupied houses. (*People v. Vang, supra*, at pp. 556–557.) *Vang* upheld attempted murder charges as to everyone in both houses, even though the defendant may have targeted only one person at each house. (*Id.* at pp. 563–564; see *People v. Bland, supra*, 28 Cal.4th at p. 330.) "The jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up. . . . [D]efendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings. The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*People v. Vang, supra*, at pp. 563–564.) The court concluded: "spraying an occupied residence with bullets from high-powered assault rifles manifests a deliberate intention to unlawfully take the lives of its inhabitants." (*Id.* at p. 556; see also *People v. Bland, supra*, at pp. 330–331 [application of kill zone theory was "virtually compel[led]" when defendant fired a flurry of bullets at a fleeing car, thereby creating a kill zone].)

10

The instant matter is indistinguishable from *Vang*, and accordingly the evidence was sufficient for the jury to find Sawyers guilty under a "kill zone" theory. The nature and scope of Sawyers's attack supports this conclusion. (See *People v. Perez* (2010) 50 Cal.4th 222, 232 [kill zone theory is defined by the nature and scope of the attack].) Sawyers and his confederates fired at least 20 rounds from three weapons, at least one of which had bullets capable of piercing walls. They shot not just at the doorstep where they saw Frison, but instead sprayed the entire house and surrounding house with gunfire. Bullet strikes and fragments were found in both the murder victim's room and the second front bedroom where Mary was sleeping. Bullet damage extended to the next-door neighbor's property. Sawyers stated, during the undercover conversation, that he had gone "lethal" with the gun. In addition to trying to kill Frison, the evidence showed he also wished to kill the twins. Since he did not know where the twins were located in the house, the jury could reasonably infer he intended to kill everyone in the house in order to ensure he hit them as well as Frison. The circumstances here – spraying a house with bullets from a high powered, wall-piercing firearm – is one of the classic examples of the kill zone theory provided by the *Bland* court.

Contrary to Sawyers's argument, the fact he was unaware Mary and Linda were in the house does not demonstrate an evidentiary insufficiency. There is no requirement the victims must have been visible to the defendant, nor must he have known of their presence. "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm." (*People v. Adams* (2008) 169 Cal.App.4th 1009,

11

1023;[6] *People v. Vang, supra*, 87 Cal.App.4th at pp. 563–564; *People v. Windfield, supra*, 3 Cal.App.5th at p. 756, rev.gr.; *People v. Stone, supra*, 46 Cal.4th at p. 140 ["a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder"]; cf. *People v. Trujillo* (2010) 181 Cal.App.4th 1344,

---

[6]   In describing the kill zone theory, the *Smith* court stated that where the kill zone theory applies, "a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but *also all others he knew were in the zone of fatal harm*." (*People v. Smith, supra*, 37 Cal.4th at p. 746, italics added.)  As *People v. Adams* explained, *Smith*'s language does not compel the conclusion that the kill zone theory applies only when the defendant knows persons other than the target are present in the kill zone. (*People v. Adams, supra*, 169 Cal.App.4th at p. 1022.)  *People v. Adams* explained that *Smith*'s observations were dicta, because that matter was not a kill zone case. (*People v. Adams, supra*, at p. 1022; see also *People v. Windfield* (2016) 3 Cal.App.5th 739, 759, review granted Jan. 11, 2017, S238073.)  Further, "the fact that a rational jury could conclude that a defendant who knows of the presence of the victims, which was the factual scenario in *People v. Smith,* had the necessary express malice does not preclude a rational jury from concluding that a defendant who does not know of the presence of the victims also had the necessary express malice if the jury found that the defendant intentionally created a zone of harm and that the victims were in that zone of harm." (*People v. Adams, supra,* at p. 1023.)  In *People v. Vang,* for example, the court concluded the defendant harbored a specific intent to kill everyone within the residences he "shot up," despite the fact he could not see all the victims. (*People v. Vang, supra,* 87 Cal.App.4th at p. 564.)  As noted, *Vang* was cited with approval in *People v. Bland, supra,* 28 Cal.4th at p. 330.

12

1357.) For example, in *Bland*'s airplane hypothetical, the court did not suggest that the bomber's liability would hinge on his or her correct estimate of how many people were on board.

Relying primarily on *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*), Sawyers argues that the evidence showed only that he intended to kill Frison and attacked in a manner that subjected other persons to risk. Under *McCloud*, he urges, the kill zone theory applies only if he specifically intended to kill *everyone* in a particular area as a means of killing a targeted individual. In *McCloud*, the defendants fired 10 shots from a semiautomatic handgun at a party attended by over 400 people. Their shots hit three victims, killing two and injuring the third. (*Id.* at pp. 790–791.) They were convicted of two counts of second degree murder and one of the defendants was convicted of 46 counts of attempted murder. (*Id.* at p. 792.) *McCloud* concluded the trial court prejudicially erred by instructing the jury on the kill zone theory because it was not supported by the evidence; moreover, insufficient evidence supported the attempted murder convictions. (*Id.* at pp. 796, 802, 805–806.) The court reasoned: "The kill zone theory . . . does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury. Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual. Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area*

13

*in which the targeted individual was located.* The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located." (*Id.* at p. 798.) The evidence in *McCloud* was deemed insufficient to support the kill zone theory because there was no showing defendants intended to kill 46 people with the 10 bullets they fired, nor would it have been possible for them to do so, given the type of ammunition used. (*Id.* at pp. 799–800; see *People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1244.)

The facts here are similar to *Vang*, not *McCloud*.[7] Sawyers used a high-powered assault rifle to spray the house with a hail

---

[7] *People v. Windfield, supra*, 3 Cal.App.5th 739, review granted, disagreed with *McCloud*'s analysis. *People v. Windfield* reasoned that *McCloud* "goes too far. The language in *Bland* . . . posits that the intent to kill the nontargeted person(s) *can be inferred* from the nature and scope of the attack or from the method employed. If, as *McCloud* asserts, the defendant must in fact intend to kill each attempted murder victim, there is no reason to employ the theory—the intent to kill is established without resort to the theory." (*People v. Windfield, supra*, at p. 760.) Moreover, *People v. Windfield* found *McCloud*'s "restrictive view" of the theory irreconcilable with other authorities, including *People v. Adams, supra,* 169 Cal.App.4th 1009. (*People v. Windfield, supra*, at p. 761.) As noted, review has been granted in *People v. Windfield,* and the question of the proper instruction on the kill zone theory is currently pending before our Supreme Court. (*People v. Canizales* (2014) 229 Cal.App.4th 820, review granted Nov. 19, 2014, S221958; *Windfield, supra*; *People v. Sek* (2015) 235 Cal.App.4th 1388, review granted July 22, 2015, S226721.) We need not reach the question of whether

of wall-piercing bullets, one of the examples the *Bland* court cited as a classic example of a kill zone.  (*Bland*, *supra*, 28 Cal.4th at p. 330.)  As in *Vang*, and in contrast to *McCloud*, from this evidence the jury could reasonably infer Sawyers fully intended to kill everyone in the house in order to be sure his target was hit.  (See *McCloud*, *supra*, 211 Cal.App.4th at p. 800, fn. 5 [distinguishing *Vang*].)  The evidence was sufficient. **]]**

**[[ End nonpublished portion ]]**

2. *Sentencing under the Three Strikes law*

Sawyers asserts that the trial court improperly sentenced him under the Three Strikes law because the information did not allege his prior burglary conviction was a strike, and he did not admit the conviction constituted a strike within the meaning of the Three Strikes law.  This contention has merit.

a. *Additional facts*

An information filed on January 22, 2015, alleged Sawyers had suffered two prior convictions, one for first degree burglary and one for receiving stolen property.  First, the information alleged Sawyers had served a prior prison term for both prior convictions within the meaning of section 667.5, subdivision (b), and stated that if proven, these convictions could each add a one-year term to Sawyers's sentence.  Second, the information alleged, as to the first degree burglary:  "as to count(s) 1, 2, 3, 4 and 5 . . . an executed sentence for a felony pursuant to this subdivision shall be served in state prison pursuant to Penal Code section 1170(h)(3) *in that* the defendant(s), Brian Alonzo Sawyers, has suffered the following prior conviction(s) of a

---

*McCloud* correctly states the law because even under its more restrictive analysis, the evidence was sufficient.

15

serious felony described in Penal Code section 1192.7 or a violent felony described in Penal Code section 667.5(c) or is required to register as a sex offender pursuant to Chapter 5.5 (commencing with Penal Code section 290) of Title 9 of Part 1." (Italics added, capitalization omitted.) Nowhere did the information expressly reference the Three Strikes law and its alternative sentencing scheme. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).)

On June 5, 2015, prior to trial, over a defense objection, the People were permitted to amend the information to add section 12022.53, subdivision (d) and (e)(1) firearm allegations. The prosecutor did not state that the information was being amended to add an allegation that the prior burglary was a strike, nor did the parties or the trial court discuss such an amendment. The trial court's minute order merely states the information was amended "to add special allegations."[8] During the same colloquy, the trial court discussed the prior convictions alleged and referred to them as "two one-year prior allegations." It queried whether Sawyers wished to bifurcate the priors, and Sawyers said he did.

On June 18, 2015, immediately after the jury retired for deliberations, the trial court and the parties discussed the amendments to the section 12022.53 allegations, in the context of the final verdict forms. The prosecutor confirmed that she had made amendments at the start of the trial, "to add (d)" to the section 12022.53 allegations. The trial court then asked defense

---

[8] The record on appeal does not contain a copy of an amended information. The superior court clerk has certified that she was unable to locate such a document in the superior court's files. She requested that the district attorney's office search their files as well, but they were unable to locate a copy.

16

counsel how he wished to handle the "bifurcated priors," and counsel stated he expected defendant to admit the priors if convicted. The trial court stated that the information "also alleged some priors," and specifically referred to page 8 of the information (the page that contained the section 667.5, subdivision (b) and the section 1170, subdivision (h)(3) allegations). The trial court stated that the information alleged "a prior strike in the VA case, that was the 459 from August 2013 and in addition to that there's another prior conviction of a 496, a nonstrike. They were bifurcated." The trial court advised Sawyers of his *Boykin/Tahl* rights[9] and his option to choose a bench trial. Sawyers was not informed of any possible punishment under the Three Strikes law. After the trial court confirmed that Sawyers had conferred with his attorney, Sawyers waived jury trial and agreed to a court trial as to the bifurcated priors.

After the jury rendered its verdict on June 19, 2015, defense counsel stated he anticipated a waiver on the prior conviction allegations. At the request of the defense, the matter was continued until August 6, 2015. On July 9, 2015, the People filed a sentencing memorandum requesting that Sawyers's sentence be doubled pursuant to the Three Strikes law. Sawyers filed a sentencing memorandum requesting concurrent terms. He did not object to application of the Three Strikes law.

On August 6, 2015, Sawyers indicated he wished to admit the prior conviction allegations. The trial court obtained Sawyers's waivers and then accepted Sawyers's admission, as

---

[9] *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122; *In re Yurko* (1974) 10 Cal.3d 857, 863.)

17

follows:  "[D]o you . . . admit that you suffered a prior conviction in case VA130808 and that was for P.C. 459 in the first degree and that was on or about August 16th, 2013?"  Sawyers replied, "Yes."[10]  The minute order states that Sawyers admitted "prior conviction on VA130808 and TA129036 pursuant to Penal Code section 667.5(b)."  The trial court sentenced Sawyers as set forth above, including doubling the terms on all counts pursuant to the Three Strikes law.  At no point did the defense object to Three Strikes sentencing.  The trial court did not address, strike or stay any of the allegations that had been alleged pursuant to section 667.5, subdivision (b).

b.  *Legal principles*

The Three Strikes law requires that prior felony convictions be pleaded and proved.  (§§ 667, subd. (c), 1170.12, subd. (a); *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1525–1526.)  In addition to this statutory requirement, a defendant "has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes."  (*People v. Mancebo* (2002) 27 Cal.4th 735, 747 (*Mancebo*); see *People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*); *People v. Robinson* (2004) 122 Cal.App.4th 275, 282 ["Due process requires the pleading apprise the defendant of the potential for an enhanced penalty and allege every fact and circumstance necessary to establish the increased penalty"].)  Thus, "except for lesser included offenses, an accused cannot be convicted of an offense of which he has not been charged,

---

**10**  Sawyers also admitted suffering the prior conviction for receiving stolen property.  He does not challenge the validity of that admission on appeal.

18

regardless of whether there was evidence at his trial to show he committed the offense.  [Citation.]  An exception exists if the accused expressly or impliedly consents or acquiesces in having the trier of fact consider a substituted, uncharged offense.  [Citations.]  The same rules apply to enhancement allegations." (*People v. Haskin* (1992) 4 Cal.App.4th 1434, 1438.)

The "Penal Code permits accusatory pleadings to be amended at any stage of the proceedings 'for any defect or insufficiency' (§ 1009), and bars reversal of a criminal judgment 'by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits' (§ 960)."  (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 919 (*Whitmer*); *People v. Sandoval* (2006) 140 Cal.App.4th 111, 132.)  "Section 969a authorizes amendments to an accusatory pleading for the purpose of alleging a prior felony conviction '[w]henever it shall be discovered' " that the pleading does not charge all prior felonies, up to the time the jury is discharged. (See *People v. Sandoval*, *supra*, at p. 132; *People v. Tindall* (2000) 24 Cal.4th 767, 776, 782.)  A pleading may be amended orally. (*People v. Sandoval*, *supra*, at pp. 132–133 ["California law does not attach any talismanic significance to the existence of a written information"]; *Whitmer*, *supra*, at p. 919 ["an information may be amended without written alterations to it"].) Additionally, under the "informal amendment" doctrine, a defendant may, by his conduct, impliedly consent to amendment of a pleading.  The " 'proceedings in the trial court may constitute an informal amendment of the accusatory pleading, when the defendant's conduct or circumstances created by him amount to an implied consent to the amendment.' "  (*Whitmer*, *supra*, at p. 919.)

19

c. *Application here*

Sawyers argues that he cannot be sentenced under the Three Strikes law despite his admission of the prior conviction, because he lacked adequate notice that he was subject to the Three Strikes sentencing scheme. The People, on the other hand, suggest we can infer from the record that "the amended information added a Three Strikes allegation as to the prior burglary conviction," and therefore it was not deficient. They point out that during the discussion in which Sawyers agreed to a bench trial on the prior conviction allegations, the trial court stated that one of the priors alleged was a strike. In the People's view, because there was no objection at that point, or later when the trial court imposed sentence pursuant to the Three Strikes law, the amended information must have included the Three Strikes allegation. Alternatively, they contend that even if the information was not so amended, Sawyers had fair notice the prior would be treated as a strike. They point out that the information alleged the prior burglary was a serious or violent felony within the meaning of sections 667.5 and 1192.7, and first degree burglary is a strike as a matter of law; at the June 18 proceeding the trial court stated that the burglary was a strike; and the failure to specify a statute by number can be overcome by factual allegations adequately informing the defendant of the sentencing allegation charged. (See *People v. Haskin*, *supra*, 4 Cal.App.4th at p. 1439 [a reference to an incorrect penal statute "can be overcome by factual allegations adequate to inform the defendant of the crime charged"]; *People v. Shoaff* (1993) 16 Cal.App.4th 1112, 1117-1118.)

In our view, Sawyers's argument carries the day. Given the record, we cannot infer the information was actually

20

amended to allege that the burglary was a strike. The fact the court file does not contain an amended information and the People failed to produce one in response to the superior court clerk's inquiry suggests no written amended information was prepared. The record likewise does not suggest the prosecutor orally amended the information to allege the burglary was a strike. The only amendment discussed on the record at the June 5 proceeding was the addition of section 12022.53, subdivision (d) and (e)(1) allegations. Defense counsel objected to that addition, but not to any other amendment, suggesting no other amendment was offered. The prosecutor never stated that she was amending to allege a strike. At the same proceeding, the trial court observed that the information contained two "one-year prior allegations," that is, the section 667.5, subdivision (b) prior prison term allegations; it did not mention a strike allegation. The trial court's statement was consistent with the original information – which contained only the section 667.5, subdivision (b) and section 1170, subdivision (h)(3) allegations – rather than with a purported amendment to add a strike allegation.[11] The failure to reference an amendment or state Sawyers was subject to Three Strikes sentencing suggests no amendment was contemplated.

Nor can we conclude the informal amendment doctrine applies. As noted, under that doctrine "a defendant's conduct may effect an informal amendment of an information without the People having formally filed a written amendment to the information." (*People v. Sandoval*, *supra*, 140 Cal.App.4th at

---

[11] That the amendment did not include a strike allegation was further evidenced by the fact that the only case cited, *People v. Oates* (2004) 32 Cal.4th 1048, related to the section 12022.53, subdivision (d) enhancement.

21

p. 133.)  For example, in *Whitmer*, the defendant was charged with grand theft under former section 487, based on his orchestration of the theft of motorcycles and other recreational vehicles.  (*Whitmer*, *supra*, 230 Cal.App.4th at p. 916.)  At the relevant time, section 487, subdivision (a) defined grand theft as theft of property valued at over $400; subdivision (d)(1) provided that theft of an automobile was likewise grand theft.  The defendant was charged with grand theft under subdivision (d)(1).  Without objection, the court instructed the jury that the defendant could be convicted of grand theft if he stole property worth more than $400, *or* if he stole an automobile.  (*Whitmer*, *supra*, at p. 920.)  *Whitmer* held that the stolen vehicles did not qualify as "automobiles" within the meaning of section 487, subdivision (d)(1), and therefore the defendant was improperly charged under that subdivision.  (*Whitmer*, *supra*, at pp. 917–919.)  Nonetheless, his conviction could stand, because he was properly convicted under section 487, subdivision (a) of theft of property valued at over $400.  Under the "informal amendment doctrine," because the defense never objected to the instructions, the defendant impliedly consented to the submission of both theories to the jury.  (*Whitmer*, *supra*, at pp. 919–920; see also *Houston*, *supra*, 54 Cal.4th at pp. 1226–1229; *People v. Toro* (1989) 47 Cal.3d 966, 976-977 [information charged only attempted murder and assault with a deadly weapon, but defendant's failure to object when the jury was instructed on, and given verdict forms including, the uncharged offense of battery with serious bodily injury, amounted to implied consent to treat the information as having been amended to include the battery charge], disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3; *People v. Hensel* (1965)

22

233 Cal.App.2d 834, 839-840 [at defense counsel's request, after a bench trial the court entered a judgment that defendant was guilty of an unpled lesser charge; by his conduct, defendant impliedly consented to informal amendment], disapproved on another ground by *People v. Triggs* (1973) 8 Cal.3d 884, 890, 894, fn. 7.)

The instant matter is distinguishable from the foregoing authorities. The "touchstone of determining the adequacy of an accusatory pleading is whether the defendant had adequate notice of the charges against him." (*People v. Sandoval*, *supra*, 140 Cal.App.4th at p. 134; *Whitmer*, *supra*, 230 Cal.App.4th at p. 919 [the function of an accusatory pleading is to give the accused notice of the charges].) The informal amendment doctrine therefore applies only when a defendant had reasonable notice of a sentence enhancement allegation despite an incomplete pleading. Here, Sawyers did not have such notice. The People did not orally amend the information as in *Sandoval*. Sawyers did not agree to jury instructions or verdict forms on an unpleaded charge, as in *Houston*, *Whitmer* and *Toro*, or request substitution of an unpled charge, as in *Hensel*. Certainly, Sawyers had notice of the factual allegations underlying Three Strikes sentencing; the information alleged, in the context of section 1170, subdivision (h)(3), the prior burglary was a serious felony described in section 1192.7 or a violent felony described in section 667.5. But neither the information nor the court proceedings gave Sawyers fair notice that his sentence would be doubled under the Three Strikes law.

The first mention of the Three Strikes law was at the June 18, 2015 proceeding, in which the trial court stated in passing that one of the priors was a strike. The defense did not

23

object.  But this statement lacked meaningful context, as there was no indication that Sawyers faced the possibility of Three Strikes sentencing.  Instead the trial court stated, "[y]ou and your attorney made the decision to bifurcate those" priors.  The bifurcated priors had been previously characterized as "one-year prior allegations," that is, alleged as the basis for section 667.5, subdivision (b) prior prison term enhancements.  When Sawyers waived his *Boykin/Tahl* rights on the bifurcated priors and agreed to a court trial, there was no mention of Three Strikes sentencing.  The sole reference to one of the bifurcated priors as a prior strike, in this context, was insufficient to give Sawyers notice that he was subject to Three Strikes sentencing.

The first explicit reference to Three Strikes sentencing was in the People's sentencing memorandum, filed July 9, 2015, *after* Sawyers had waived his right to a jury trial on the prior conviction allegations.  When Sawyers admitted his priors, he was not advised that the prior burglary was a strike.  Neither the trial court nor the prosecutor advised that the admission could result in Three Strikes sentencing.  Indeed, the minute order states only that Sawyers admitted the priors pursuant to section 667.5, subdivision (b).  While the People are correct that defense counsel never objected to the prosecution's sentencing memorandum or to the trial court's imposition of a second strike sentence, on these facts we cannot conclude from those omissions alone that the informal amendment doctrine applies.

Thus, lacking a written, oral, or informal amendment, Three Strikes sentencing was impermissible.  Several authorities compel this conclusion.  In *Mancebo*, *supra*, 27 Cal.4th 735, the defendant was charged with a variety of sexual offenses against two victims.  (*Id.* at p. 740.)  As to each offense, two special

24

circumstances were alleged under the "One Strike" law,[12] but a multiple-victim special circumstance was not alleged. The jury found the defendant personally used a firearm, but the prosecution was forced to choose between using that fact to either impose an enhancement under section 12022.5, subdivision (a), or a life term under the One Strike law. (*Mancebo*, *supra*, at p. 744.) For the first time, at sentencing, the prosecutor sought to dismiss the gun-use allegation under the One Strike law and substitute an unpleaded multiple-victim circumstance so that both the determinate-term enhancement and the life term could be imposed. *Mancebo* concluded section 667.61, subdivision (f) "precluded the trial court from striking those circumstances in order to free up gun use as a basis for imposing lesser enhancement terms under section 12022.5(a)." (*Mancebo*, *supra*, at pp. 749–750, fn. 7.) It reasoned: "the information neither alleged multiple victim circumstances nor referenced subdivision (e)(5) of section 667.61 in connection with those counts. In other words, no factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a)." (*Id.* at p. 745.) *Mancebo* concluded the defendant's due process rights (as well as the statutory pleading requirements of the One Strike law) were violated "not because defendant was never afforded notice that he was being charged with crimes against two victims; he obviously

---

[12] Like the Three Strikes law, the One Strike law is an alternative sentencing scheme. (*People v. Carbajal* (2013) 56 Cal.4th 521, 534; *Mancebo, supra,* 27 Cal.4th at p. 738.)

was, and not because defendant was never afforded notice that the One Strike law would apply to his case; again, he was. Sentencing error occurred because defendant was given notice that gun use would be used as one of the two pleaded and minimally required circumstances in support of the One Strike terms, whereafter, at sentencing, the trial court used the *unpled* circumstance of multiple victims to support the One Strike terms, and further imposed two 10-year section 12022.5(a) enhancements that could otherwise not have been imposed but for the purported substitution." (*Id.* at p. 753.)

In *People v. Arias* (2010) 182 Cal.App.4th 1009, the information charged the defendant with attempted murder, but failed to allege the attempted murders were willful, deliberate and premeditated as expressly required by section 664, subdivision (a). Despite this omission the jury found the defendant guilty of "attempted first-degree" murder and the trial court sentenced him to life terms pursuant to section 664. Relying on *Mancebo*, the appellate court concluded that because neither the information nor any pleading gave defendant notice that he was potentially subject to the enhanced punishment provision under section 664, subdivision (a), the sentence was improper. (*People v. Arias*, *supra*, at pp. 1019–1021.)

In *People v. Botello* (2010) 183 Cal.App.4th 1014, the People charged personal firearm use enhancements against two defendants pursuant to section 12022.53, subdivisions (b), (c), and (d), but did not allege a principal armed allegation under subdivision (e)(1). (*People v. Botello*, *supra*, at p. 1021.) The People conceded the evidence was insufficient to prove personal use of a firearm as to either defendant, but argued the section 12022.53 enhancements could nonetheless be imposed pursuant

to subdivision (e)(1).  (*Botello*, *supra*, at p. 1022.)  *Botello* held application of subdivision (e)(1) would violate that subdivision's pleading and proof requirements, as well as the notice requirement of due process.  (*Botello*, *supra*, at p. 1022.)  " '[N]o factual allegation in the information or pleading in the statutory language informed defendant[s] that if [they were] convicted of the underlying charged offenses,' they would be subject to the firearm enhancements of section 12022.53, subdivisions (b) through (d) by virtue of the circumstances listed in subdivision (e)(1)." (*People v. Botello, supra,* at p. 1027; see also *People v. Haskin*, *supra*, 4 Cal.App.4th at p. 1440 [where nothing in the record suggested defendant had impliedly consented to have the court consider a section 667.5, subdivision (b) allegation as a nonincluded section 667 (five-year) enhancement, trial court was without authority to impose a sentence greater than that authorized by section 667.5, subdivision (b)].)

Most recently, *People v. Wilford* (2017) 12 Cal.App.5th 827 came to a similar conclusion.  There, the defendant was charged with domestic violence.  Section 273.5, subdivision (f)(1) provides that a defendant who has suffered specified priors within seven years of the charged offense may be punished with a two-, four-, or five-year term.  Subdivision (h)(1) provides that if such a person is granted probation, he or she must serve at least 15 days in jail.  The information in *People v. Wilford* included a section 273.5, subdivision (h)(1) allegation, but not a subdivision (f)(1) allegation.  (*People v. Wilford*, *supra*, at pp. 835-836.)  The trial court found the subdivision (h)(1) allegations true.  Without objection, it sentenced Wilford pursuant to subdivision (f)(1), based on its true finding on the subdivision (h)(1) allegation.  (*People v. Wilford, supra,* at p. 836.)  This was improper.

27

Although the information alleged Wilford had been convicted of a qualifying offense within the previous seven years, the pleading referenced only section 273.5, subdivision (h)(1).  "Nothing in the amended information gave any hint that the prosecution also sought to make Wilford subject to the provisions of section 273.5, subdivision (f)(1), which would increase the applicable sentencing range." (*People v. Wilford, supra*, at p. 838.)  Although the information included "every fact necessary to impose the sentence under section 273.5, subdivision (f)(1)," there was no advisement that the prosecution intended to use the factual allegations to increase Wilford's sentence under subdivision (f)(1). (*People v. Wilford, supra*, at p. 838.)  It was "inconsequential whether section 273.5, subdivision (f)(1) is labeled an enhancement, alternative sentencing scheme, or a sentencing statute.  The amended information specified that, for counts 5 and 6, Wilford faced a sentence of two, three, or four years with the possibility of an additional 15 days under section 273.5, subdivision (h)(1) for each count.  There was no indication whatsoever that Wilford faced the possibility of a sentence of two, four, or five years for each of those same offenses under section 273.5, subdivision (f)(1).  Further, the prosecutor only sought an increased sentence under that subdivision after the jury returned its verdict and the court found true the qualifying prior conviction.  The resulting sentence under section 273.5, subdivision (f)(1) violated Wilford's due process rights and cannot stand." (*Id.* at p. 840.)

The foregoing authorities compel the conclusion that Sawyers cannot be subjected to Three Strikes sentencing.  Similar to the One Strike sentencing scheme at issue in *Mancebo*, the Three Strikes scheme includes a pleading and proof requirement.  (§§ 667, subd. (c); 1170.12, subd. (a).)  As explained

28

above, Sawyers had notice that the burglary was alleged to be a serious or violent felony for purposes of section 1170, subdivision (h)(3).  But, because the information did not allege section 667, subdivisions (b) through (i) or section 1170.12, subdivisions (a) through (d), or otherwise reference the Three Strikes law, Sawyers had insufficient notice that the People would seek sentencing under the Three Strikes law if he admitted the prior, a "critical shortcoming."  (*People v. Wilford*, *supra*, 12 Cal.App.5th at p. 840; see *Mancebo*, *supra*, 27 Cal.4th at p. 745; *People v. Botello*, *supra*, 183 Cal.App.4th at p. 1027.)  As noted, neither the trial court's mention of the strike nor the information gave Sawyers even an inkling that the People would seek to use the prior burglary as the basis for Three Strikes sentencing.  When Sawyers waived his right to a jury trial on the prior conviction allegations, he had no notice that the People intended to request Three Strikes sentencing.  By the time he admitted the prior, the People had filed their sentencing memorandum, which did indeed request application of the Three Strikes law.  But the People offer no persuasive authority suggesting that, on the facts presented here, a sentencing memorandum is an adequate substitute for a proper pleading.

The People also contend that Sawyers's failure to object to the imposition of a Three Strikes sentence forfeited his claim that he lacked adequate notice.  But it is the People's burden to properly plead enhancement allegations, not the defendant's responsibility to ferret them out.  A similar argument was rejected in *Mancebo*, which concluded that imposing a sentence based on an unpleaded gun-use circumstance resulted in an unauthorized sentence not subject to the forfeiture doctrine.  (*Mancebo*, *supra*, 27 Cal.4th at pp. 749–750, fn. 7; *People v. Arias*,

29

*supra*, 182 Cal.App.4th at p. 1017 ["imposition of a sentencing enhancement based on an unpled enhancement allegation in violation of statutory pleading requirements amounted to an unauthorized sentence"].)[13]

The People's reliance on *People v. Houston* in support of their forfeiture argument is unavailing. There, the defendant argued he was improperly sentenced to life imprisonment for each of 10 counts of attempted murder, because the indictment had failed to alleged the attempted murders were willful, deliberate, and premeditated, as required by section 664, subdivision (a). (*People v. Houston, supra,* 54 Cal.4th at p. 1225.) Our Supreme Court concluded the defendant had forfeited his contention. (*Ibid.*) During the defense case, the trial court informed the defendant that the prosecution was attempting to charge premeditation; cautioned that if " 'that's not right,' " the parties should inform the court; and stated that premeditated attempted murder was punishable by life in prison. (*Id.* at p. 1226.) The court also presented the parties with draft verdict forms which asked jurors to determine whether the attempted murders were willful, deliberate, and premeditated, and subsequently instructed the jury on premeditation. At no time did the defendant object. Under these circumstances, *Houston* concluded, the defendant had forfeited his contention that the flawed indictment precluded the imposition of the life sentences. (*Id.* at p. 1228.) He had adequate notice "of the punishment he faced," because the trial court had "expressly noted that defendant, if convicted, would be sentenced to life imprisonment."

---

[13]  In light of our conclusion, we do not reach the parties' arguments regarding ineffective assistance of counsel.

(*Id.* at p. 1227.)  But the same cannot be said here.  As we have explained, Sawyers was not notified, before waiving his right to a jury trial, that he potentially faced a Three Strikes sentence. Accordingly, we order the sentence vacated and remand the matter for resentencing.

**[[ Begin nonpublished portion ]]**

3.  *Custody credits*

At sentencing, the trial court awarded Sawyers 53 days of presentence conduct credit.  The People assert that section 2933.2 bars the award of presentence conduct credits to persons convicted of murder.  (§ 2933.2, subd. (a); see *People v. Calles* (2012) 209 Cal.App.4th 1200, 1226; *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1431–1432.)  We agree.  At resentencing, the trial court is directed to modify the judgment to omit the presentence conduct credits. **]]**

**[[ End nonpublished portion ]]**

DISPOSITION

The sentence is vacated and the matter is remanded for resentencing consistent with the opinions expressed herein.  In all other respects, the judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**

BACHNER, J.[*]

We concur:

EDMON, P. J.

LAVIN, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.